UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA

                                      Ind. No.
                                       22 cr 294 (KPF)

-against-


NASIR COOPER,

                        Defendant.
----------------------------------------------------------x

## SENTENCING MEMORANDUM

Jeffrey G. Pittell
**MAHER & PITTELL, LLP**
*Attorneys for Defendant*
42-40 Bell Blvd., Ste. 302
Bayside, New York 11361
(516) 829-2299

## PRELIMINARY STATEMENT

The Sentencing Memorandum is submitted on behalf of Nasir Cooper.  Based upon the information and reasons set forth herein, we submit that a downward variance from the applicable advisory Sentencing Guidelines is a fair and just disposition in this case.

## PERSONAL BACKGROUND

Nasir Cooper was not born into a life society would call a "healthy environment."

His father was never a part of his life.  Nasir has never even met him.

Nasir's relationship with his mother was not much better.  When he was born, she was a raging drug addict.  She abused marijuana, opioids and alcohol.  Nasir lived with his mother until he was about three years old.  Due to his young age, he does not remember this period in his life.  As a result of her drug and alcohol abuse, Nasir's mother lost custody of him.  He placed in the care of the New York City Administration for Children Services ("ACS").

When he initially placed in ACS care, for about eight months, Nasir lived in a foster group home.  Although he was still very young, he remembers it being a terrifying experience.

ACS approved Nasir's paternal grandmother, Anne Johnson, to become his foster guardian. He then lived with her and husband.[1] Ms. Johnson and her husband lived in a two bedroom apartment along with two other boys who were in their foster care (a cousin and close family friend). Nasir and the two boys shared a single bedroom.

Nasir's grandparents lived in the Morrisania neighborhood of the Bronx. When Nasir was growing up there, crime was rampant. It was a common occurrence for him to see drugs sold on street corners. He saw fights and heard gunfire. He once recalls seeing a shooting victim lying, dead, on the street in front of his building.

While Nasir was living with his grandmother, ACS authorized his mother -- who also lived in the Bronx -- to have weekend (either single day or overnight) visits every two weeks. However, these visits were sporadic because due to her always being high. At times, she neglected to pick him up or arrange for the visit.

When Nasir did visit his mother, it was always traumatic. Whenever Nasir visited her, she would smoke weed, take pills and drink alcohol in his presence. She also went through a string of boyfriends. Sometimes, after Nasir went to sleep, his mother and a boyfriend would go out for the night. When they did so, they would

---

[1]

Ms. Johnson's husband is not the paternal grandfather of Nasir. However, Nasir views him as a grandfather figure in his life.

leave Nasir (who was only five or six years old) alone in the apartment. Nasir recalls one instance where he woke up at 2 a.m. and no one was in the apartment. Thinking his mother might be out front, he went outside. When he walked outside, none one was there. However, he locked himself out of the building. He ended up sitting on the stoop, wearing only his underwear and freezing cold, until his mother and boyfriend came home at 6 a.m. Another traumatic memory is of a boyfriend always beating up on his mother. Whenever he saw this, Nasir would try to intervene. However, the boyfriend would push him away.

Eventually, when Nasir was approximately eight years old, due to these incidents, Ms. Johnson would not allow Nasir to visit his mother. This led to a custody dispute between Ms. Johnson and Nasir's mother. It resulted in Nasir being temporarily designated for placement in an ACS group home until the dispute was resolved. However, having a painful memory from his prior stay in a group home, on the first day he arrived in the group home, Nasir ran away. For approximately a year, he stayed with friends and sometimes slept on roofs of apartment buildings. Eventually, he was apprehended by ACS -- on a truancy warrant -- and returned to live with Ms. Johnson.

Throughout his life, Nasir has suffered from mental health problems. As a child, from time to time, he intentionally hurt himself by burning his arm with a

lighter or matches.  When he was approximately thirteen, he tried to commit suicide by slashing his wrist with a knife.  Following this episode, he was hospitalized for approximately one month.

Nasir has been diagnosed as suffering from Bipolar Disorder, Attention Deficient Hyperactivity Disorder ("ADHD") and depression.  He has been prescribed various medication including *Adderall* (for ADHD) and *Remeron* (for Depression).  At times, he has met with a therapist.

Nasir has also struggled with drug addiction.  Like his mother he has abused pills (including Xanax, Percoet and Ecstacy) and alcohol.  He started using them when he was approximately twelve years old and continued to do so up through his arrest in this case.

Although not an excuse, but as positive step toward rehabilitation, Nasir has identified some of the causes and triggers for his drug abuse and self harm as likely including: i) as a child, witnessing his mother's drug use and emulating her behavior; ii) although his grandparents were loving parental figures, growing up with a sense of low self esteem by persistently feeling unwanted by his biological parents who were absent from his life; and, iii) attempting to self medicate his mental health problems.  He realizes he is in dire need of a long term treatment plan which addresses both his drug abuse and mental health disorders.

Despite the foregoing, there have been bright moments in Nasir's life. Educationally, Ms. Johnson was able to send him to a private high school (freshman year) at *New York Military Academy* (a boarding school near West Point, NY). While there, he learned about living a disciplined life and played on the basketball and lacrosse teams. For the remainder of his high school years, he attended *John F. Kennedy High School* in the Bronx where, for three years, he played on the football team. Although he did not earn enough credits to graduate, Nasir contends he earned his GED while at JFK.

In addition to Ms. Johnson and her husband raising Nasir, while growing up, he was in contact with his maternal grandparents, Cindy and George Walker.[2] The Walkers live in Pawling, Dutchess County, New York. Nasir often visited them on weekends and during school vacations. When Nasir visited them, he experienced a life far different from life in the Bronx. They lived in a rural area where some houses were on acres of land. He participated in a wide variety of outdoor recreation including ice skating, riding dirt bikes and snowboarding.

Prior to his arrest in this case, Nasir was involved in a personal relationship, for a few years, with Liselot Paulino. They first met when they were teenagers

---

[2]

The Walkers adopted Nasir's mother. Although they are not his biological grandparents, Nasir considers them to be his maternal grandparents.

attending JFK High School.  For many years, before their relationship became romantic, they were close friends.  While Nasir was in custody on this case, Ms. Paulino gave birth to their daughter who is now almost two years old.  In anticipation of Nasir's sentencing, Ms. Paulino has written a letter to the Court.  She writes that it is heartbreaking for their daughter to have only been able to "bond" with Nasir "on camera."  Ms. Paulino has two other daughters from a prior relationship.  These daughters consider Nasir to be a father figure in their lives.  In her letter, Ms. Paulino writes that Nasir "dearly loves" the girls.  Ms. Paulino and Nasir are no longer in a committed personal relationship.  However, they still remain close friends and speak almost daily.  Her letter confirms she wants Nasir to continue being a part of their daughter's life.  (A copy of her letter is included in the Exhibit Binder to this Memorandum).

Nasir is currently involved in a personal relationship with Cynthia Foy.  Ms. Foy has submitted a letter on his behalf.  (A copy is in the Exhibit Binder).  In her letter, Ms. Foy states they speak on the telephone "almost everyday."  She confirms he loves and cares for his family including his grandmother and daughter. She reports that, "everyday he keeps this positive energy and an ongoing spirit."  She indicates he is willing to "become better then before" and is looking forward to "getting his life

back into order for him and his daughter and just becoming a man that she can look up to."

## EXPERIENCES WHILE IN CUSTODY

We trust that, during the past three years, Your Honor has been inundated with bail applications and motions for sentence reductions pursuant to 18 U.S.C. §3582(c) (also known as motions for "compassionate release") predicated upon the unduly harsh conditions -- within MDC Brooklyn ("MDC") and other local administrative jails -- which arose due to their response to the Covid Pandemic.

### The Lockdowns

One of the most onerous conditions has been a "lockdown" policy implemented by the jails.

When the Pandemic started, in an attempt to stop the spread of Covid-19, inmates were locked in two person cells often for twenty-four hours per day, seven days per week. For many months, they were only allowed out of their cells a few days per week for brief periods to take a shower and contact their family. Even as the Pandemic waned, the lockdowns continue to persist.

At present, the inmates at MDC -- where Nasir is currently housed -- are locked in their cell every single weekend (from Friday night until Monday morning) plus holidays.  In addition to the weekend lockdowns, there are frequent one to three day lockdowns -- of the entire jail -- whenever there is a "security incident" anywhere in the jail.  Typically, for the duration of these weekend and incident lockdowns, inmates are not released from their cells not even to shower nor use the phone/email.[3]

The current weekend and holiday lockdowns are not imposed for protection against Covid-19.  They are done to accommodate staffing shortages.  As such, the lockdown policy -- which was a component of the BOP's temporary effort to provide social distancing during the Pandemic -- has been transformed into a permanent, cost-cutting, employment practice.

### Daily Life Within Prison

During lockdowns, meals are served to Nasir in his cell.  Many times, they are cold and bagged offerings with the main course being either a peanut butter and jelly or bologna sandwich.

---

[3]

Nasir was previously been housed at the Essex County Correctional Center ("Essex").  He reports it also had a weekend lockdown policy although not as onerous as MDC.

8

While on a lockdown, fresh drinking water is not available. If he is thirsty, Nasir must drink the brown-colored water which comes out of the sink faucet in his cell. At times, the water pressure in his cell is shut off. When this occurs, he cannot even drink the dirty sink water. Also, when this occurs, the toilet in his cell will not flush. If he, or his cellmate, pass a bowel movement, they cannot flush it down. As a result, they are forced to endure the stench of their feces -- including while they are eating meals in their cell -- until the water pressure is turned back on.

During the period that Nasir has been in both Essex and MDC, he has not been outside. He has not taken a breath of fresh air. He has not even seen the sun nor sky as his cell window is painted over.

Nasir has seen violence within the jail. He has seen approximately five inmates get stabbed.

Despite these harsh conditions, Nasir has tried to use his time productively. While at Essex, he was employed as "tier worker" and cleaned his unit for approximately eight hours per day. He was paid $21 per month. At MDC, he has requested a job. However, none has been offered.

While being locked in his cell, in order to keep his mind stimulated, Nasir constantly reads books. He estimates he has read more than twenty novels since he has been in jail.

While at Essex, he has taken the following courses:

| Grammar | Fractions | Into to Decimals |
|---|---|---|
| Intro to Addition and Subtraction | Multiplication and Division | What is Facebook |
| Getting a Job | Resume Writing | Job Success |
| Money Basics | | |

(Copies of certificates of completion of these courses are in the Exhibit Binder).

## ACCEPTANCE OF RESPONSIBILITY

While in custody during the past two years -- and spending much of it locked down in a tiny cell for prolonged periods of time -- Nasir has had plenty of time for self-introspection. He does not blame anyone, nor his life circumstances, for his prior offenses nor for the offense at bar. Despite the trauma in his life, he has come to realize he has many blessings in his life. He has grandparents (on both sides) who love him as surrogate parents. In addition to his grandparents, he is emotionally supported by other persons such as the ones who have submitted character letters on his behalf. (*See*, the letters from Ms. Foy, Ms. Paulino and a close friend, Isaiah Bedford, in the Exhibit Binder). He has a young daughter who anxiously looks forward to meeting him in person.

In anticipation of his sentencing, Nasir has written a letter to the Court.  (A copy of the letter will be provided to the Court under a separate letter submitted at the same time as this Sentencing Memorandum).

## OBJECTION TO THE PSR

### Objection to the Calculation of the Base Offense Level (PSR ¶24,32)

We previously submitted objections to the PSR's calculation of Nasir's advisory Sentencing Guideline Base Offense Level.  The objections are set forth in the Presentence Guidelines Memorandum (the "Initial Memorandum") (ECF Doc 27) and the Supplemental Presentence Guidelines Memorandum (the "Supplemental Memorandum") (ECF Doc 42).

Previously the Court ruled on the argument asserted in the Initial Memorandum.  This ruling has been adopted by the Probation Department and is incorporated in the Final PSR.  In order to ensure the record is preserved, we still advance our objections set forth in the Initial Memorandum.

The Supplemental Memorandum, which was recently filed, raises an additional objection.  In the interest of brevity, we defer to that submission which is still pending.

**Objection to Allegations Regarding a Prison Incident (PSR ¶¶ 5-7)**

Within these paragraphs, the PSR alleges Nasir, along with other inmates, assaulted another inmate at Essex.  The PSR alleges Nasir's involvement in the incident was upheld by the institution and that he was disciplined for thirteen days in disciplinary detention.

We contend these allegations are incorrect.  Nasir was initially accused to have been involved in the incident and was held in administrative segregation, for thirteen days, while an investigation was conducted.  However, the investigation did not determine he was involved in the incident.  We reviewed the records of this incident which were obtained by the Probation Department. The records do not indicate Nasir was found to be a participant nor subjected to a disciplinary sanction.  The merely indicate further investigation was needed.  Nasir was then returned to general population.  There are no records of any further investigation being conducted.

Based upon the foregoing, we contend the PSR is incorrect as by stating Nasir was a participant in the incident and that the thirteen day hold was a discipline imposed upon him. As such, we object to the inclusion of these paragraphs in the PSR as they are inaccurate or misleading.  The inclusion of this information in the PSR will only serve to prejudice Nasir in terms of the Court's sentencing consideration and the BOP's security considerations.

12

**Education (PSR Second Cover Page)**

Nasir contends he earned his GED while at JFK high school during 2014.  We

object to the PSR alleging he does not have one.

## CONSIDERATION OF A PENDING AMENDMENT TO THE ADVISORY SENTENCING GUIDELINES

Regardless of the Court's determination of our objection to the calculation of

Nasir's Base Offense Level, we urge the Court to give consideration to an upcoming

Amendment to the Sentencing Guidelines which, if in effect now, would affect the

calculation of his advisory Sentencing Guidelines.

The Sentencing Guidelines are scheduled to be amended on November 1, 2023

(the "Amendments").  The Amendments modify USSG §4A1.1(d) which currently

applies two "status points" to an offender who commits the underlying offense while

on parole (or other criminal justice supervision).  Pursuant to this Amendment, the

current version of §4A1.1(d) will be deleted in its entirety.  Applicable to Nasir, it

will be replaced by a provision which provides the imposition of zero status points

for an offender (who has six criminal history points of less) who commits an offense

while under criminal justice supervison.

Currently, the PSR reports that Nasir has six criminal history points due to his having two prior convictions.  (PSR ¶¶36-38).  The offense in this case occurred while Nasir was on parole for one of these convicitons.  As such, the PSR adds two status points pursuant to (soon to be amended) §4A1.1(d).  (PSR ¶39).  This results in him having a total of eight criminal history points which places him in Criminal History Category IV.  (PSR ¶40).  However, due to the Amendment removing the imposition of the two status points, Nasir will have a total of six, instead of eight, criminal history points.  This will place him in CHC III instead of IV.

In determining a sentence, 18 U.S.C. §3553(a)(4)(A)(i), requires a court to consider, "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission . . . subject to any amendments made to such guidelines by act of Congress (**regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments** . . .)."  (Emphasis added, internal paragraph numbering omitted).

Although this Amendment is pending submission to Congress and the Federal Register, it has a specified effective date of November 1, 2023.  Accordingly, pursuant to §3553(a)(4)(A)(i), in the calculation of Nasir's advisory Sentencing Guidelines, we urge the Court to consider to this Amendment is if were currently in

effect -- or as grounds for a variance -- as it impacts the calculation of Nasir's advisory Sentencing Guidelines by reducing his CHC from IV to III.

If the pending Amendment is given consideration -- wherein Nasir's CHC is III instead of IV -- then, due to our pending objection (in the Supplemental Memorandum) to the calculation of Nasir's Base Offense Level, there are two potential advisory Sentencing Guidelines scenarios.

One scenario is based upon our objection set forth in the Supplemental Memorandum.  The other is based upon the calculation in the final PSR.  These two scenarios are follows:

*First Scenario:*
*Per the objection in the Supplemental Memorandum*

| Base Offense Level | 14 |
| Less: Acceptance of Responsibility | -2 |
| Total offense Level ("TOL") | 16 |

Based upon CHC III, the corresponding advisory Sentencing Guideline range is 15-21 months.

*Second Scenario:*
*Per the Final PSR*

| Base Offense Level | 24 |
|---|---|
| Less: Acceptance of Responsibility | -3 |
| Total offense Level ("TOL") | 21 |

Based upon CHC III, the corresponding advisory Sentencing Guideline range is 46-57 months.

**REQUESTED SENTENCE AND SUPPORTING REASONS**

When appears for sentencing, Nasir will have been in custody for approximately twenty-five months in regard to this case.  However, as further discussed below, it is possible that as few as ten months of this period will be credited by the BOP toward the term of his sentence.

In determining Nasir's sentence, along with the information set forth in this Sentencing Memorandum, we request the Court give consideration to the following factors:

***First***, the lockdowns, and other harsh conditions, Nasir has been forced to endure while in custody at MDC and Essex are a factor which warrants consideration of a variance.

16

Being on a lockdown is an unwarranted form of punishment.[4]  We submit that being repeatedly locked in a small cell for several days in a row -- with little mental stimulation -- can readily cause mental torment brought on by sheer boredom.  This can be especially painful for someone, such as Nasir, who suffers from mental health disorders.

Due to this circumstance, along with the other conditions, Nasir has been forced to endure, we submit it is reasonable for the Court to consider fashioning a sentence which gives him at least 'one for one' extra jail time credit -- for each day during the approximately twenty-five months that he has been in jail -- to compensate for each day of harsh conditions he has endured suffered while in jail.  *See e.g., U.S. v. Valencia-Lopez*, 2022 WL 198604 *3 (EDNY, NGG), ("detention during the pandemic has been more punitive than before essentially the equivalent of either time and a half or two times what would ordinarily be served") (internal citation and quotations omitted, quoting *U.S. v. Gonzalez*, No. 18-cr-699 (SDNY, JPO) (April 16, 2021) (Dkt. 250, Sentencing Tr. at 17:17-18:5)).

***Second,*** 18 U.S.C. §3553(a)(1) requires that, prior to imposition of a sentence, a court shall consider the "history and characteristics of the defendant."  As such, we

---

[4]

Notably, when the BOP punishes inmates for misconduct, they are often sent to the SHU and locked in a cell for twenty three hours per day.

urge the Court to give consideration to Nasir's personal background described in the PSR and this Memorandum.

**Third**, Nasir has pleaded guilty and accepts responsibility for his involvement in the offense.

**Fourth,** as indicated above, when he appears for sentencing, Nasir will have been in custody for approximately twenty-five months in regard to this case. However, we are concerned that only approximately ten months of this jail time may be credited, by the BOP, toward the sentence to be imposed by Your Honor.

Nasir was initially arrested based upon the conduct in this case, by the NYPD, on or about November 16, 2020. Following his arrest, he was held in custody and prosecuted in New York State Court, Bronx County (the "Bronx Case"). Approximately nine months later, the Bronx case was dismissed on August 27, 2021. Thereafter, he was released from custody.

Approximately four months later, on December 14, 2021, Nasir was arrested on an unrelated matter (which was dismissed) and also charged with a parole violation. Pursuant to the parole violation, he was sentenced to a term of nine months. While serving this sentence, on March 24, 2022, he was transferred into federal custody for the charges in this case pursuant to a writ. Thereafter, for the past sixteen months, he has remained in federal custody. The sentence on the parole

violation ended on September 14, 2022.  As such, we believe the BOP will start to count his jail time credit, in this case, as of September 14, 2022.

We acknowledge the BOP will not give Nasir jail time credit for the approximate six month period while he was federal custody (from March 24 through September 14, 2022) because that period will be credited toward the parole violation. *See*, 18 U.S.C. §3585(b).[5]

However, pursuant to 18 U.S.C. §3585(b)(2), we contend that Nasir should be entitled to jail credit (applied to this case) for the time he was in custody on the Bronx Case since that case was based upon the conduct in this case and was dismissed. Since this term preceded Nasir being placed in federal custody, we are concerned the BOP may not be aware of, or may not include, it in Nasir's prison term calculation. Accordingly, to ensure this term is counted toward his sentence in this case -- since

---

[5]

This statue provides:

    (b)    Credit for Prior Custody.—A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—

        (1)    as a result of the offense for which the sentence was imposed; or

        (2)    as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

    that has not been credited against another sentence.

it was time in "official detention" and was "a result of the offense for which the sentence was imposed" -- we request the Judgment of Conviction include the following provision:

> The defendant is to receive jail term credit for the period spent in official detention from November 16, 2020 through August 27, 2021, in the custody of the New York City Department of Correctional Services, as this term of custody was the result of a charge for which the defendant was arrested after the commission of the offense, for which the sentence is imposed in this case, and that this term has not been credited against any other sentence. In addition, the defendant is to receive credit for the period he has been in federal custody commencing on September 14, 2022.

*Fifth,* as noted in the PSR, Nasir will not reside with Ms. Paulino nor Ms. Johnson upon his release. Accordingly, in the event the BOP does not designate him to a Residential Reentry Center ("RRC"), for the final portion of his prison sentence, we suggest that, as a condition of his Supervised Release, a term in an RRC might be beneficial as it will provide time for him to find employment and place to reside.

*Sixth,* due to Nasir having a prior history of substance abuse and suffering from mental health disorders, we suggest a condition of his Supervised Release include provision of substance abuse treatment and mental health counseling.

## CONCLUSION

Based upon the foregoing, we respectfully request the Court impose a variance below the applicable advisory Sentencing Guidelines in this case.

Dated:      July 14, 2023
            Bayside, NY


                                        Respectfully submitted,
                                        /s/
                                        Jeffrey G. Pittell, Esq.
                                        Maher & Pittell, LLP
                                        *Attorneys for Defendant*
                                        42-40 Bell Blvd,  Suite 302
                                        Bayside, New York  11361
                                        (516) 829-2299


cc:    Nasir Cooper
       Peter Davis/Jacob Fiddelman/Elizabeth Espinoza, AUSA